## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| WESLEY NEWMAN, on behalf of himself and others similarly situated, | : : : | CIVIL ACTION FILE NO. |
| Plaintiff, | : : | |
| v. | : : : | **COMPLAINT – CLASS ACTION** |
| KAILA & SOLOMON LAW GROUP LLC d/b/a GUARDIAN LAW | : : : : | **JURY TRIAL DEMANDED** |
| AND | : : | |
| CLICTREE LLC | : : : | |
| Defendants. | : : | |

Plaintiff Wesley Newman (hereinafter referred to as "Plaintiff"), individually and on behalf of all others similarly situated, alleges on personal knowledge, investigation of his counsel, and on information and belief, as follows:

1.     As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell

phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

2.      However, the TCPA doesn't only restrict robocalls.

3.      Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

4.      "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, she can add her number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See   id.*; 16 C.F.R. §

310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect her own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

5.     The Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA alleging that Kaila & Solomon Law Group LLC d/b/a Guardian Law ("Guardian"), by and through its agent ClicTree LLC, violated the TCPA by sending multiple telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent as well as sending such calls with illegal pre-recorded voices.

6.     Because the calls were transmitted using technology capable of generating thousands of similar calls per day, Plaintiff brings this action on behalf

of a proposed nationwide class of other persons who were sent the same illegal telemarketing calls.

7.      A class action is the best means of obtaining redress for the Defendant's illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## PARTIES

8.      Plaintiff Wesley Newman is an individual residing in the Northern District of Illinois.

9.      Defendant Kaila & Solomon Law Group LLC is a law firm that is headquartered and has its principal place of business in this District.

10.      Defendant ClicTree LLC is a lead generation and telemarketing company hired by Guardian to generate leads on its behalf and has its headquarters and principal place of business in New Jersey.

## JURISDICTION AND VENUE

11.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

12.      This Court has general personal jurisdiction over Guardian because it is headquartered and has its principal place of business in this District. This court has specific personal jurisdiction over ClicTree because it contracted with Guardian

in a contract that, among other things, and upon information and belief, had a Georgia choice of law and forum provision and conducted the illegal telemarketing at issue on behalf of Guardian, a Georgia LLC.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the calls at issue were orchestrated and designed to obtain business for a company located in this District, and therefore a substantial part of the events giving rise to the claim occurred in this District.

**BACKGROUND**

<u>The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.</u>

14.     The TCPA prohibits sending multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

15.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

16.     A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

17.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and

provide a private right of action against any entity that sends those solicitations, or "on whose behalf" such solicitations are sent. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

The TCPA Prohibits Prerecorded Calls to Cell Phones

18.    In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

19.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A).

20.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

21.    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations

implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

22.    Congress singled out these services for special protection either because Congress realized their special importance in terms of consumer privacy and therefore protected them (as in the case of cellular phones), or because the numbers are assigned to services for which the called party is charged, thus shifting the cost of automated or prerecorded messages onto consumers. *See Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2363, (2020) (Gorsuch, J. & Thomas, J., concurring in part and dissenting in part).

23.    This cause of action applies to users of any one of the four protected services (pager, cellular, specialized mobile radio [i.e. radiotelephony locator beacons or dispatch systems], or another radio common carrier service [i.e. ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged for the call. *See Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *6 (E.D. Pa. July 15, 2021).

24.    "Non-emergency prerecorded voice or autodialed calls to [the destinations enumerated in 47 U.S.C. § 227(b)(1)(A)] are permissible only with the prior express consent of the called party." This includes calls made using artificial or prerecorded voices pitching services. *See* FCC Enforcement Advisory: Tel.

Consumer Prot. Act Robocall & Text Rules - Biennial Reminder for Pol. Campaigns About Robocall & Text Abuse, 31 FCC Rcd. 1940, 1941 n.6 (2016) [hereinafter FCC Advisory].

25.    Non-consensual, non-emergency calls placed using an ATDS or an artificial or prerecorded voice violate 47 U.S.C. § 227(b)(1)(A), regardless of the purpose of the call. *Victory Phones*, 2021 WL 3007258, at *6 (rejecting claim that noncommercial survey calls were exempt and holding that "[T]he operative language of the TCPA is unambiguous. Section 227(b)(1)(A) prohibits placing artificial and prerecorded voice calls to a variety of telephone numbers."). To hold otherwise would read the words "any person" and "any call" out of the statute. *See id.*

## FACTUAL ALLEGATIONS

26.    The Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

27.    Plaintiff Newman's telephone number, (940) XXX-XXXX, is a non-commercial telephone number that is used for residential purposes.

28.    Plaintiff Newman uses the telephone number for his own personal, residential, and household needs and reasons.

29.    Plaintiff Newman does not use the number for business reasons or business use.

30.     The number is a residential telephone line because it is assigned to a telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

31.     The number is assigned to a residential cellular telephone service.

32.     Plaintiff Newman's number has been on the National Do Not Call Registry for years since he registered it on the Registry prior to receiving the calls at issue.

33.     Despite that, Mr. Newman received at least 41 violative calls from Defendant ClicTree sent on behalf of and to generate leads for personal injury legal representation claims by Defendant Guardian.

34.     Some of these calls were placed with prerecorded messages. For example, on June 13, 2024 at 4:36 PM, the Plaintiff received a call from the caller ID 940-226-4114. This call began with a robot, "Christopher," an obvious robot who wanted to know if the Plaintiff had been in a car accident in the past two years. The call then disconnected.

35.     The calls continued, including on July 10 at 12:09 PM from 940-325-3945, where another robot, "Christy," and asked the Plaintiff questions. The Plaintiff said nothing, but the robot continued, wanting to know if the Plaintiff had been in a car accident in the past two years and if he was interested in getting compensation. The Plaintiff still said nothing, and so the robot gave up and

attempted to transfer the call to a human. A message then played saying "the number you have dialed is not in service." The call then disconnected.

36.    The Plaintiff received similar calls, with the Plaintiff not saying anything, and the robot simply proceeding with the call, but the call then not transferring to a human or disconnecting, including on 7/12, 7/15, and two calls on 7/16, from the caller IDs 940-392-2633, 940-272-0272, 940-498-9527, and 940-567-6931.

37.    Finally, the Plaintiff was able to identify the caller based on a call at 1:40 PM on 7/17 from the caller ID 940-565-9246. During this call, the Plaintiff was eventually connected to "Steve," with "Auto Claims Solutions," who asked more information about the Plaintiff's "accident" and stated that he could get the Plaintiff compensation through a law firm. "Steve" wanted to know an alternative number to contact the Plaintiff on. The Plaintiff provided an alternative number of 817-YYY-YYYY, a number which is not on the Do Not Call Registry.

38.    Upon information and belief, "Steve" wanted this alternative number so that Defendant ClicTree could sell the instant lead as one made to a number that is not on the Do Not Call Registry and thus misrepresent the lead as a legally obtained lead.

39.    Immediately thereafter, the Plaintiff received a call from "Steve" on the 817-YYY-YYYY number. After going over details of the Plaintiff's "accident"

and personal information, the Plaintiff was then transferred to "James" from "[Unintelligible] Solutions," who stated that he received an "online inquiry" that the Plaintiff wanted to speak with an accident attorney.

40.    The Plaintiff made no such inquiry.

41.    Thereafter, the Plaintiff was transferred to "Lilly" with the "The Motor Vehicle Accident Recorded Line." "Lilly" asked the Plaintiff peculiar questions to see if the Plaintiff "pre-qualified," including confirming that the Plaintiff's number was not on the Do Not Call Registry.

42.    After several minutes, "Lilly" told the Plaintiff that she would now "connect you with a representative at the law firm."

43.    A pre-recorded message then played, saying "You've reached Legal Help Advisors."

44.    An individual named "Alexander" then picked up and "Lilly" transferred the Plaintiff, saying "Hi Alex! This is Lilly . . . and I have a lead . . . with case number 00055771. His name is Wes." "Alex" then went over the information Plaintiff had already provided to "Lilly."

45.    "Alex" told the Plaintiff that he would send the Plaintiff a text message with a form he was required to complete before "Alex" would tell Plaintiff who the law firm would be.

46.     Thereafter, the Plaintiff received a text message with a link to legalactionpartner.com/mva-gl01-en which Plaintiff was required to fill out.

47.     Upon information and belief, "Legal Action Partner," which also does business under the name "Legal Help Advisors," is a client intake company hired by Defendant Guardian to obtain client's information and have them sign the initial retainer.

48.     Upon information and belief, the characters "gl01" in the link sent to Plaintiff correspond with "Guardian Law."

49.     There is no other four-letter combination of letters and numbers on the website that lead to a valid webpage besides "gl01," which supports the inference that the "Legal Action Partner" website is exclusive to Defendant Guardian. For example, the links legalactionpartner.com/mva-aa01-en through legalactionpartner.com/mva-zz99-en, are all invalid.

50.     In any event, the Plaintiff eventually received an email from "Alexander Allen," alexander@legalhelpadvisor.com, containing a link to Guardian Law's retainer agreement to sign, specifically naming the Defendant:



TEL (404) 255-9000
FAX (770) 462-3349

### STANDARD FEE ATTORNEY-CLIENT CONTRACT

The undersigned ("CLIENT") hereby retains **Kaila & Solomon Law Group, LLC d/b/a Guardian Law** ("FIRM") to provide legal services for claims related to an accident/incident that occurred on/or about the date of _____2/9/2024_____. Client authorizes Firm to perform all services and incur all costs and expenses as attorneys, in their sole discretion, deem appropriate regarding this representation. In consideration of the money paid herewith by Client to Firm, and based upon the mutual promises and covenants hereinafter contained, the parties hereto agree as follows:

Firm agrees to use its "best efforts" to represent Client to the best of professional ability in all phases of representation. Client understands and agrees that Firm makes no representation or warranty regarding the work, the chances of success, nor the likely results which will be obtained except that all services will be performed for Client in a professional manner, and in full compliance and accordance with the Canons of Professional Responsibility and Ethics as established by the State Bar of Texas and the Texas Supreme Court. Client specifically acknowledges that Firm has not made any promises, guarantees of success, nor representations or warranties of what outcome Client will obtain from Firm's performance of legal services.

#### FIRM FEES

In consideration of the services to be rendered by Firm, Client agrees to pay Firm attorneys' fees which shall be withheld from the gross settlement amount obtained before the deduction of expenses:

- Thirty-three and one-third percent (33.3%) of the total gross amount of any sum or sums recovered by settlement <u>without</u> suit being filed; or
- Forty percent (40%) of the total gross amount of any sum or sums recovered <u>after</u> suit is filed.

#### - IF THERE IS NO RECOVERY, ATTORNEYS WILL RECEIVE NO FEE -

51.     On July 22, the Plaintiff emailed "Alex's" email, as well as Defendant Guardian and Legal Action Partner. Plaintiff stated that the calls were illegal, that he did not want them, and to be placed on the Defendants' internal do not call list.

52.     About 20 minutes later, the Plaintiff received a call from "Alex," referenced the above-reproduced agreement, and was calling to follow up. The Plaintiff reiterated his do not call request and also requested that the Plaintiff email "Alex's" boss, which he did.

53.    Despite these clear do not call requests, the calls from the Defendant continued, and continue through to present. The calls all bear the same indicia as the previous calls, beginning with a randomly named robot stating that they can assist with the Plaintiff's accident and want to know if the Plaintiff had been in an accident in the past two years.

54.    However, unlike the previous calls, once the Plaintiff is transferred to a human, the human remarks that the Plaintiff is on a do not call list and that they will be unable to assist the Plaintiff.

55.    After this happens, the Plaintiff will hear an identical message stating, "you have been kicked from this conference," and the line will then disconnect.

56.    It is obvious that the Defendants' internal do not call list does not extend to the robots it has initially placing the calls and only is actionable at such point as a human being enters the call and then attempts to effectuate the transfer to Defendant Guardian.

57.    Thereafter, the Plaintiff corresponded with counsel for Defendant ClicTree, but those conversations trailed off.

58.    However, after this occurred, and the Plaintiff continued to get calls, the human agents seemed to be shocked by something in the Plaintiff's call notes. For example, during a call on November 6, 2024, the Plaintiff spoke with a human

named "Elsa," who stopped mid-sales pitch, exclaimed "Oh my God, you have such a good, uh, profile," and then hung up.

59.    Defendant ClicTree was identified as the company Guardian hired to generate leads on its behalf and as the entity that placed the illegal calls, which were subsequently transferred to Defendant Guardian.

60.    Defendant Guardian ratified ClicTree's conduct by accepting the multiple leads and referrals generated as a result of ClicTree's illegal telemarketing conduct and authorizing ClicTree to continue contacting the Plaintiff, including after the Plaintiff requested that the calls stop.

61.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

62.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

63.    The FCC has instructed that sellers such as Guardian may not avoid liability by outsourcing telemarketing to agents, such as ClicTree, and that companies like Guardian cannot avoid liability by outsourcing client intake services out to any additional third parties:

[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (cleaned up).

64.     In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

65.     Guardian is liable for telemarketing calls placed by ClicTree and any subvendors they may have hired and which were ultimately placed with the purpose and aim of and using Guardian's name to generate customers for Guardian, including the Plaintiff, and which ultimately resulted in the Plaintiff receiving Guardian's retainer agreement.

66.     Guardian uses telemarketing and lead generation companies like ClicTree who it authorizes to make to phone calls to potential customers, send

those callers to another company to intake those clients, and then send Guardian only the interested ones who signed Guardian's retainer.

67.    Guardian controlled the day-to-day activities of ClicTree by allowing them to work up the beginning of client sales on its behalf and then transfer the caller to its intake personnel, who would only speak with interested, pre-qualified customers that met criteria set by Guardian.

68.    Guardian also could have prohibited ClicTree from using leads generated to numbers on its internal Do Not Call list, let alone calls placed to numbers on the Do Not Call Registry and using highly-illegal prerecorded messages.

69.    They did not.

70.    Finally, Guardian could have terminated ClicTree once it learned of ClicTree's illegal marketing conduct.

71.    It did not. In fact, ClicTree used the Plaintiff's complaint to continue to harass the Plaintiff.

72.    A reasonable seller like Guardian or a reasonable marketing company like ClicTree would investigate why its agents were using illegal outbound telemarketing calls to sell its products to numbers which should have been on both its internal Do Not Call lists and the National Do Not Call list, taking steps to

evade such lists, as well as using highly-illegal prerecorded calls, as well as harassing those who had asked them to stop.

73.    Moreover, a reasonable seller would also investigate into the reasons why their agents would be calling numbers to numbers on the Do Not Call Registry with highly illegal prerecorded messages.

74.    They did not.

75.    Guardian hired ClicTree without a proper investigation, and did not terminate them when they were informed of ClicTree's illegal calling conduct.

76.    As such, Guardian knowingly ratified ClicTree's conduct.

77.    The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

78.    Plaintiff never consented to receive calls from Defendants.

79.    In fact, as described above, the Plaintiff explicitly revoked any purported consent to receive calls from the Defendants, but the calls continued.

80.    The calls were all placed to sell Defendant Guardian's goods and services, including legal services.

81.     Plaintiff's privacy has been violated by the above-described telemarketing calls.

82.     The Plaintiff never provided his consent or requested the calls.

83.     The aforementioned calls to the Plaintiff were unwanted.

84.     The calls were non-consensual encounters.

85.     The Defendants had the ability to immediately honor Plaintiff's do not call requests, but they did not. Instead, they continued to harass the Plaintiff for daring to make such a request.

86.     Plaintiff and all members of the Classes, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

88.     Plaintiff brings this action on behalf of herself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

89.     Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **ClicTree Robocall Class**: Plaintiff and all persons within the United States: (1) to whose cellular telephone numbers (2) ClicTree, or a third party on their behalf, placed a call using artificial or pre-record messages (3) within the four years prior to the filing of the Complaint.
>
> > **Guardian Robocall Sub-Class:** Plaintiff and all persons within the United States: (1) to whose

cellular telephone numbers (2) ClicTree, or a third party on their behalf, placed a call using artificial or pre-record messages (3) that advertised, or were intended to advertise, Guardian's goods and/or services (4) within the four years prior to the filing of the Complaint.

**National Do Not Call Registry Class:** All persons within the United States: (1) whose telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; and (4) within the four years prior to the filing of the Complaint.

**Internal Do Not Call Class:** All persons within the United States to whom: (1) Defendants (or a third-party acting on behalf of Defendants) sent (2) two or more telemarketing calls in a 12-month period, (3) who were not current customers of the Defendants at the time of the calls, (4) who had previously asked for the calls to stop and (5) within the four years prior to the filing of the Complaint.

90.    Plaintiff is a member of and will fairly and adequately represent and protect the interests of the classes.

91.    Excluded from the Classes are counsel, Defendants, and any entities in which Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

92.    Plaintiff and all members of the Classes have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance,

waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephone that cluttered legitimate communications.

93.    This Class Action Complaint seeks injunctive relief and money damages.

94.    The Classes, as defined above, are identifiable through Defendants' dialer records, other phone records, and phone number databases.

95.    Plaintiff does not know the exact number of members in the Classes, but Plaintiff reasonably believes Class members number, at minimum, in the hundreds as the calls were sent in a generic fashion.

96.    The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

97.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

98.    There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

99.    There are numerous questions of law and fact common to Plaintiff and to the proposed Classes, including, but not limited to, the following:

a.  Whether Defendants sent multiple calls to Plaintiff and members of the National Do Not Call Registry Class;

b.  whether Defendants made calls using artificial or prerecorded voices to Plaintiff and members of the Robocall Class and Sub-Class;

c.  whether Defendants recorded or honored "do not call" requests of Plaintiff and members of the Internal Do Not Call Class;

d.  Whether Defendants' conduct constitutes a violation of the TCPA; and

e.  Whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

100.  Further, Plaintiff will fairly and adequately represent and protect the interests of the Classes because the Plaintiff has no interests which are antagonistic to any member of the Classes.

101.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so.

102.   Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records maintained by Defendants and/or their agents.

103.   The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

## **FIRST CAUSE OF ACTION**

**Statutory Violations of the Telephone Consumer Protection Act**
**(47        U.S.C. § 227(b)) on behalf of the Robocall Class**

104.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

105.   The Defendants violated the TCPA by sending or causing to be sent calls to the cellular telephones and other protected telephones of Plaintiff and members of the Robocall Class using a pre-recorded messages without their prior express written consent.

106.   As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Robocall Class members are entitled to an award of $500 in statutory

damages for each and every violation of the statute, pursuant to 47 U.S.C. §

227(b)(3)(B).

107.   The Plaintiff and Robocall Class members are entitled to an award of

treble damages if the Defendants' actions are found to have been knowing or

willful.

108.   Plaintiff and Robocall Class members are also entitled to and do seek

injunctive relief prohibiting Defendants from using a pre-recorded voice in the

future, except for emergency purposes.

## SECOND CAUSE OF ACTION

### Violation of the Telephone Consumer Protection Act
### (47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c) on behalf of Plaintiff and the National Do Not Call Registry Class)

109.   Plaintiff incorporates the allegations from all previous paragraphs as if

fully set forth herein.

110.   The foregoing acts and omissions of Defendants and/or their affiliates,

agents, and/or other persons or entities acting on Defendants' behalf constitute

numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending

telemarketing calls, except for emergency purposes, to Plaintiff and members of

the National Do Not Call Registry Class despite their numbers being on the

National Do Not Call Registry.

111.   Defendants' violations were negligent, willful, or knowing.

112.   As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are entitled to an award of up to $500 in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful.

113.   Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from sending telemarketing calls, including calls, to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

## **THIRD CAUSE OF ACTION**

### **Violation of the Telephone Consumer Protection Act**
### **(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(d) on behalf of Plaintiff and the Internal Do Not Call Registry Class)**

114.   Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

115.   The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending

telemarketing calls, except for emergency purposes, to Plaintiff and members of the Internal Do Not Call Class despite previously requesting that such calls stop.

116.    Defendants' violations were negligent, willful, or knowing.

117.    As a result of Defendants' and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Internal Do Not Call Class are entitled to an award of up to $500 and in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A.    Injunctive relief prohibiting Defendants from sending calls or calls soliciting the purchase of its goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

B.    Injunctive relief prohibiting Defendants from calling telephone numbers who had previously asked not to be called except for emergency purposes, in the future;

C.    Injunctive relief prohibiting Defendants from using artificial or pre-recorded voices to contact cell phones and other protected lines, except for emergency purposes, in the future;

D.    That the Court enter a judgment awarding Plaintiff and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

E.    An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes;

F.    Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Date: March 20, 2025

*Counsel for Plaintiff and all others similarly situated*

By: /s/ *Tristan W. Gillespie*
Tristan W. Gillespie, Esq.
600 Blakenham Court
Johns Creek, GA 30022
Telephone: (404) 276-7277
Email: Gillespie.tristan@gmail.com